UNITED STATES of America,
Plaintiff,

v.

Bruce Paul MARRIE, Defendant.

UNITED STATES of America,
Plaintiff,

v.

Malcolm William ANDREWS,
Defendant.

UNITED STATES of America,
Plaintiff,

v.

Robert James GAZDA, Defendant.

Crim. Nos. 72–298, 72–150 and 72–161.

United States District Court,
W. D. Pennsylvania.

April 25, 1973.

Blair Griffith, First Asst. U. S. Atty., Pittsburgh, Pa., for plaintiff.

Michael P. Malakoff, and Marjorie H. Matson, Pittsburgh, Pa., for defendants.

## OPINION

DUMBAULD, District Judge.

In airline parlance, the interesting question is presented here whether a draft board may utilize "overbooking" in order to offset anticipated "no-shows."

Two of the three defendants were indeed "no-shows", as the briefs describe them; they utterly and completely failed and neglected to report for induction pursuant to orders of the board. They did not, as some draftees (including the third defendant, Andrews) do, report to the induction center but then refuse to take the symbolic step forward signifying their subjection to the articles of war. They simply stayed away; perhaps mindful of the maxim that "absence of body is better than presence of mind." Their defense, when prosecuted under 50 App.U.S.C. § 462(a)[1] is that the orders were invalid.[2] The Court must now test the validity of this defense of invalidity.

*A priori*, on principle and as a matter of common sense, it would seem only ordinary prudence for a draft board to select and issue induction notices to more registrants than the number of vacancies to be filled in the armed forces, when experience as well as expectation shows that many of those who are summoned fail to take their place in the serried ranks of the nation's defenders.[3]

There are many reasons for this. Some are rejected by the armed services as unfit or failing to meet the qualifications prescribed by standards in force. Some will obtain postponements for various reasons; others will, like defendants Marrie and Gazda, fail to report; a certain number who report, like defendant Andrews, will refuse induction. Hence the courts, if not otherwise required by plain provisions of law, will uphold reasonable and good faith efforts on the part of the Selective Service System to meet the nation's manpower needs by provident measures designed to supply the necessary number of men without inconvenient delays and lost motion.[4] Such forethought would include calling up more men than will actually be needed, in order to make sure that the number required will be available. As the poet Horace says, it is good to draw from a heaping granary and to drink from an abundant fountain.[5]

What, then, does the statute (and the regulations) provide with respect to this matter? Defendants contend that whatever discretion exists to overbook must be exercised at the State level, not by the local board; and the Government's brief indicates that in some areas, such as California, such a system is in fact practiced. In Pennsylvania, however, we are told by the Government's brief, the State director overbooks only to offset rejections, but makes no allowance for no-shows.[6]

1. Which provides that "Any . . . person charged . . . with the duty of carrying out any of the provisions [of the statute], or the rules or regulations made or directions given thereunder, who shall knowingly fail or neglect to perform such duty . . . shall, upon conviction . . . be punished by imprisonment for not more than five years etc."

2. The basic defense is "overcall," *i. e.* what we have referred to as "overbooking." Other defenses applicable to individual defendants will be discussed subsequently. Contentions that the Court erred in frustrating attempts to harass the draft board, by seeking their addresses and other unidentified fishing expeditions, deserve no further comment.

3. Otherwise they might have occasion to repeat the scriptural lament: "Were there not ten [called]? But where are the nine?" Lk. 17:17.

4. See United States v. Cunningham, 345 F.Supp. 37, 39–40 (E.D.Pa.1972), where figures are compiled regarding the number who fall by the wayside.

5. "Atque suave est magno tollere acervo.
 \* \* \* \* \*
 . . . magno de flumine mallem
Quam ex hoc fonticulo tantundem sumere."
 Horace, Satires, I, lines 51, 55–56.

6. The Court in *Cunningham* [see note 4 *supra*] said that the State Director took all the factors into consideration in making his calls on local boards during the first three months of 1971. A letter from James H. Evans, a witness in that case, to U. S. Attorney Thornburgh dated March 27, 1973, which is not in evidence but was appended to the Government's brief, states that the *Cunningham* court misunderstood his testimony, and that the State Director made allowance only for rejection.

The Government apparently attaches some importance to this distinction, as the Assistant United States Attorney wished to reopen the case after it was *sub judice* to call Major James H. Evans after defense counsel properly pointed out that discussion of the point in a letter from Evans attached to the Government's brief was not evidence in the cases at bar. We absolutely agree with this contention of defense counsel, as well as his observation that "Major Evans's disagreement [with Judge Ditter's statement in *Cunningham*] is immaterial to any issue in this case." We also agree that the decision whether to reopen rests with defendants, as double jeopardy might arise if the Government undertook to prove additional facts after the testimony is once closed.[7]

Again, *a priori*, it would seem that this problem of attrition is one that would have to be dealt with at all levels. The evidence in the instant cases showed, for example, that in order to grant a postponement (which is sometimes sanctioned under certain circumstances) an induction order must first be issued so that the postponement will have something upon which validly to act.[8] When the board knows that the first name on its list of persons given induction notices is that of a person entitled to and who will undoubtedly receive a postponement, would it not be the height of absurdity to hold that the board could not simultaneously issue a notice to another registrant, who will hopefully be more available for service?[9]

Congress has provided that selection of persons for service shall be made in an impartial manner under regulations prescribed by the President, and that the quotas for each State shall be proportional to the number of available registrants in such State, less credit for residents serving in the armed forces.[10] Establishment of local boards by the President is authorized.[11] An annual drawing using birthdays of registrants establishes a "random selection sequence for induction."[12]

The *sedes materiae* with respect to the functions of the local board is found in 32 C.F.R. 1631.7 which [as of September 26, 1970] provides:

(a) *When a call is received* by a Notice of Call on Local Board (SSS Form 201) from the State Director of Selective Service *for a specified number of men to be delivered for induction,* or for a specified number of men in a medical, dental, or allied specialist category to be delivered for induction, the Executive Secretary or clerk,

---

7. Defendants elected not to reopen. See letter of Michael P. Malakoff, Esq., dated April 11, 1973, which we have directed to be filed with the record along with his earlier letter of March 30, 1973, and the Government's brief containing the Evans letter referred to in note 6, for the possible convenience of reviewing courts. We disregard and ignore completely the contents of the Evans letter. *Non constat* whether the practice in Pennsylvania in early 1971 was the same as in late 1971 when defendants in the cases at bar were drafted. We may even assume *arguendo* that at the time relevant here the State Director *did* consider all factors. The issue nevertheless in the instant case is whether *the local board* may resort to "overcall," not whether the State Director may. Of course we understand defendants to contend that even if the State Director may, the local board may not. However, we hold that prudent measures

may be taken at every level to meet the obligations incumbent upon that level.

8. Regulations 32 C.F.R. 1632.2(a) provides that "In case of [emergencies], the local board may, *after the Order to Report for Induction (SSS Form No. 252) has been issued,* postpone the time when such registrant shall so report, for a period not to exceed 60 days . . . ." [Italics supplied].

9. In the case of defendant Andrews, to meet a call for one man induction orders were issued to one Kwasniewski (known to be a schoolteacher entitled to postponement) and also to defendant Andrews. GX–4.

10. 50 App.U.S.C. § 455.

11. 50 App.U.S.C. § 460.

12. 32 C.F.R. 1631.1, originating in President Nixon's proclamation of Nov. 26, 1969.

if so authorized, or a local board member shall select; as provided herein, and *issue orders to* report for induction to *the number of men required to fill the call* from among its registrants who have been classified in Class I–A or Class I–A–O and have been found acceptable for service in the Armed Forces and to whom a Statement of Acceptability (DD Form 62) has been mailed at least 21 days before the date fixed for induction . . . [Italics supplied]

Very judicious comment on this provision appears in the Government's brief (p. 3):

It is significant that the regulation states the mandate in terms of "the number of men required to fill the call" rather than the "specified number of men to be delivered for induction" prescribed by the call. In view of the widely differing ability of local boards to deliver a specified number it is only reasonable that each local board would be directed to issue orders to a sufficient number of registrants to assure delivery of the required number of men for induction. A local board in an area where no-shows were relatively few would obviously not be required to issue as many orders to meet a required call as would a local board serving an area having a high incidence of draft evaders.

■ Stated in terms of interpretation, the question is whether "the number of men required to fill the call" means "such number as after anticipated attrition will suffice to actually fill the call" or whether it means "a number identical to the specified number of men to be delivered for induction." The former interpretation clearly seems to be indicated. As the Government's brief (p. 4) likewise aptly states, to "deliver for induction" does not mean the same as to "order for induction." This is shown by the experience in the case at bar with respect to defendants, all of whom proved to be "no-go"s. The regulation authorizes the board to order for induction the number of men required in order effectually to deliver for induction the number specified in the State director's call.

■ We therefore conclude that "overcall" is an insufficient defense.

Defendant Gazda invokes a defense based on alleged improper order of call. He contends he was improperly included in the "extended priority selection group," that is to say was improperly subjected to "prolonged vulnerability" to being called for induction.

Here the applicable provision is 32 C. F.R. 1631.7(b) [as of September 26, 1970] which states that

Registrants shall be selected and ordered to report for induction in the following categories and in the order indicated:

(1) Volunteers. . . .

(2) Nonvolunteers in the Extended Priority Selection Group in the order of their random sequence number established by random selection procedures prescribed in accordance with paragraph (d) of Section 1631.5.

(3) Nonvolunteers in the First Priority Selection Group in the order of their random sequence number established by random selection procedures prescribed in accordance with paragraph (d) of Section 1631.5.

These groups are defined in 32 F.R.C. 1671.7(c):

(1) Extended Priority Selection Group consists of registrants who on December 31 were members of the First Priority Selection Group whose random sequence number had been reached but who had not been issued Orders to Report for Induction.

(2) First Priority Selection Group:

\* \* \* \* \* \*

(ii) . . . In the calendar year 1971 and each calendar year thereafter, non-volunteers in Class I–A or Class I–A–O who prior to January of each such calendar year have attained the age of 19 years but not of 20

years and nonvolunteers who prior to January 1 of each such calendar year have attained the age of 19 but not of 26 years and who during that year are classified into Class I–A or Class I–A–O.

Consequences of membership in these groups is governed by 32 C.F.R. 1631.-7(d):

(4) Members of the First Priority Selection Group on December 31 in any calendar year whose random sequence number had been reached but who had not been issued Orders to Report for Induction during the calendar year shall be assigned to the Extended Priority Selection Group for the immediately succeeding calendar year.

(5) Members of the Extended Priority Selection Group who have not been issued orders to report for induction and originally scheduled for a date prior to April 1 shall forthwith be assigned to the lower priority selection group to which they would have been assigned had they never been assigned to the Extended Priority Selection Group; except that members of the Extended Priority Selection Group who would have been ordered to report for induction to fill the last call in the first quarter of the calendar year but who could not be issued orders shall remain in the Extended Priority Selection Group and shall be ordered to report for induction as soon as practicable. Circumstances which would prevent such an order shall include but not be limited to those arising from a personal appearance, appeal, preinduction physical examination, reconsideration, judicial proceeding, or inability of the local board to act.

In other words a member of the first priority group whose number is up but who has not been ordered to report by the end of the year is subject to prolonged vulnerability during the first quarter of the next year; but the period of vulnerability is further prolonged in the case of men "who would have been ordered to report for induction to fill the last call in the first quarter of the calendar year but who could not be issued orders." They "shall be ordered to report for induction as soon as practicable."

The examples given of circumstances which would prevent issuance of an order during the first quarter of the year indicate that the hindrance is of a procedural character, such as would arise from the prescribed time limits for various steps, or from the necessity of complying with "due process" requirements or with procedures established in the law or regulations or applicable judicial decisions.

Applying these rules to Gazda, we find that

(1) Gazda's random sequence number was X–067 and that number had been reached.

(2) He was ordered on January 5, 1971, to report on January 25, 1971. After expiration on July 8, 1970, of an occupational deferment, he was reclassified as I–A on September 10, 1970, notwithstanding his having filed on September 18, 1968, a form 150 seeking classification as a conscientious objector.

(3) On May 6, 1971, Henry R. Sherrard, Acting State Director, wrote to the Board pointing out that:

The Third Circuit Court of Appeals has ruled that the local board when denying a pre-induction order claim of conscientious objection, must state the grounds for the denial and the reasons why.

The file of the subject registrant is herewith returned to be processed in accordance with the above.

Acting under SSSR 1625.3, the State Director requests your local board to reopen and consider anew the classification of this registrant.

In event the local board denies the conscientious objection claim, it must state the grounds for denial and give the reasons why. This statement must be placed on page 8 of the Selec-

tive Service System Classification Questionnaire, SSS Form 100, SSS Form 112 and the registrant so advised, by letter, which can accompany the SSS Form 110.

(4) After vain efforts to schedule an interview with Gazda, the Board on July 14, 1971, reclassified him I–A and wrote him the following statement of reasons:

At the local board meeting on July 13, 1971 your claim of conscientious objector was denied on the ground of your opposition to the Vietnam war.

The reason for this decision was that the claim was based on a particular war rather than on all wars. You repeatedly stated you are against Vietnam war.

(5) Thereafter on October 8, 1971, an order to report on November 9, 1971 was issued to Gazda. On November 5, 1971, he returned the bus ticket and announced his refusal to report.

(6) It is for failure to comply with the order of October 8, 1971, that defendant Gazda was indicted on June 21, 1972, at No. 72–161 Criminal.

Defendant admits that on January 5, 1971), when the earlier order to report was issued, he would have been vulnerable if legally classified as I–A (Brief p. 3).

However, due to an intervening decision of the Court of Appeals, this order was subject to a procedural infirmity in that it contained no statement of reasons.

Defendant contends that the Board *could* have effectively drafted him during the first quarter of 1971 by a valid order, and that, not having done so (*i. e.*, having attempted to do so by an invalid order subject to procedural infirmities and subsequently superseded) it can not now be heard to say that defendant Gazda was a registrant "who could not be issued orders."

However, we believe that delay necessarily incurred in order to effect compliance with novel and unexpected requirements imposed by virtue of a decision of the Court of Appeals is of a like character with delays attributable to other necessary pre-induction procedures, such as those listed *exempli gratia* in the Regulation, (namely those arising from a personal appearance, appeal, physical examination, reconsideration, judicial proceeding, or inability of the local board to act[13]). We therefore conclude that Gazda was a registrant "who could not be issued orders" during the first quarter of the year, and therefore could be deemed to be still vulnerable and continuing as a member of the Extended Priority Selection Group until his induction became "practicable."

In other words the board was not remiss or negligent in ignoring the registrant, but was legitimately delayed in completing the disposition of his case by issuing an induction order.

Gazda's induction order is therefore valid, and his defense insufficient.

Defendant Andrews asserts a specific defense applicable only to him, namely that he was unlawfully classified as I–A while he was still entitled to a 2–S student deferment.

Until June 10, 1971, Andrews had a student deferment. On that date he was reclassified as I–A. The information from the college available to the board showed that his degree would be awarded on June 14, 1971, (GX–1, p. 20). On June 15, 1971, the college notified the board that in fact he had been graduated on June 14, 1971. This notification was received by the board on June 23, 1971, (GX–1, p. 32). On June 24, 1971, he appealed the I–A classification. On July 12, 1971, the file was forwarded for consideration of the appeal. On July 28, 1971, the appeal board reclassified him as I–A. (GX–1, p. 36).

---

13. Doubtless the last named disability, if it is not to swallow up all that precede it, would refer to lack of quorum, illness of board members, inclement weather, or other reasons preventing the board from taking action (as distinguished from procedural obstacles making disposition of a particular case premature or unripe).

It is settled law that the appeal board's action constitutes a classification *de novo*. Therefore the classification which supports his induction order is clearly valid. The student status had indubitably expired on June 14, 1971. Nor is the doctrine enunciated by Judge Gibbons (that the local board and the appeal board must both have had opportunity to consider all pertinent issues and evidence) of benefit to Andrews. The local board and the appeal board both had before them the identical file, which uncontrovertibly established that Andrews was no longer entitled to 2–S student status. The classification of July 28, 1971, is clearly valid.

It would be hypertechnical to hold that the July 28, 1971, classification was invalid because it was precipitated by or was the outgrowth of a premature June 10, 1971, classification by the local board.

Here again, as in the case of overcall, it seems that the board was merely exercising appropriate foresight and administrative efficiency when (perhaps because of convenience with respect to times of meeting by the board) action was taken on June 10, 1971, rather than waiting for the next meeting of the board after June 14, 1971. As in the case of overcall where the board knew that certain registrants called would be postponed, here the board knew that Andrews was to be graduated on June 14, 1971. His student status was bound to expire on that date by the mere passage of time. No discretionary function was involved, or any issue requiring fact-finding. It was just like the expiration of a non-renewable lease of real estate. It came about solely by operation of Father Time.

Assuming *arguendo* that the board is not entitled to jump the gun, and that reclassification is a matter *strictissimi juris*, where no regard may be paid to administrative convenience even in mere matters of the calendar, the Government still has a good ground upon which to support the I–A classification by the board.

32 C.F.R. 1622.25(a) ordains that 2–S classification shall continue "until such registrant completes the requirement for his baccalaureate degree" or fails academically or reaches the age of 24.[14]

This language merely · accords deferment until completion of the "requirement" for a degree. It does not mandate deferment until the very moment when the diploma is handed to the young man who is "safe now, in the wide, wide world." It is common knowledge that many students leave the campus before commencement and receive their degrees *in absentia*. *Non constat* in the record before us where Andrews was on commencement day. Many students have begun employment, or take vacations, or for various reasons choose not to participate in the formal graduation exercises. It would be, again, a hypertechnical interpretation to construe "requirement for" a baccalaureate degree as meaning "receipt of" the degree.

*De minimis non curat lex.* This maxim· has twofold application to the defense of Andrews. His defense is insufficient.

Defendants Gazda and Andrews will therefore be found guilty. In the case of defendant Marrie, however, we are constrained to find a deficiency of proof in the Government's case. Upon examining the record, the Court found that the only evidence in the record from which an inference could be made that defendant Marrie had been classified I–A is from page 9 of his Selective Service File, being page 8 of his Classification Questionnaire (Form 100). Government counsel concedes that this entry on Form 100 "is the only record

14. Except that the statute reads "requirements" instead of "requirement", 50 App. U.S.C. § 456(h)(1), Act of June 30, 1967, 81 Stat. 102, spoke in identical terms until it was repealed by the Act of September 28, 1971, 85 Stat. 350.

from which an inference could be made that he was classified I–A."[15]

The Court concludes that this entry is merely in the nature of a docket entry, and that in a matter of crucial importance such as classification the action of the board[16] should be proved either by the board's minutes (Form 112–A) a copy of which 32 C.F.R. 1623.-4(c) provides shall be publicly posted in a conspicuous place, or by the board's Classification Record (Form 102). 32 C.F.R. 1623.4(d) provides:

(d) When the local board classifies or changes the classification of a registrant, it shall record such classification on the Classification Questionnaire (SSS Form 100), the Classification Record (SSS Form 102), and in the space provided therefor on the face of the Cover Sheet (SSS Form 101).

This Opinion shall be deemed to constitute the Court's findings of fact and conclusions of law.

15. See the Court's letter of April 17, 1973, to Counsel; the Government's response dated April 23, 1973, and defendant's response dated April 24, 1973, all of which are ordered to be filed with the record for the possible convenience of reviewing courts.

16. The Court of Appeals for the Third Circuit has held that "It is clear that a draft board may only take action on a registrant's classification by voting." Application of Shapiro, 392 F.2d 397, 400 (C.A.3, 1968).